UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TRAVIS R. TIFFANY                                             PLAINTIFF

v.                                          CIVIL ACTION NO. 3:13-CV-839-JGH

CAROLYN W. COLVIN, Acting Commissioner of Social Security            DEFENDANT

**FINDINGS OF FACT
CONCLUSIONS OF LAW
AND RECOMMENDATION**

Plaintiff Travis R. Tiffany has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied his

application for disability insurance benefits (DIB). Tiffany applied for DIB on July 23, 2012,

alleging that he was disabled as of Nov. 23, 2007, due to traumatic brain injury, post-traumatic

stress disorder (PTSD), headaches, tinnitus, anxiety and shrapnel wounds (Tr. 23, 32-50, 151,

178, 216). The Commissioner denied Tiffany's claims on initial consideration (Tr. 87-88) and

on reconsideration (Tr. 99, 100-110). Tiffany requested a hearing before an Administrative Law

Judge (ALJ) (Tr. 125).

ALJ John R. Price conducted a hearing in Louisville, Kentucky, on May 2, 2013 (Tr. 28-

59). Tiffany attended with his attorney, Greg Marks (Tr. 28). Tiffany and vocational expert

(VE) William Irvin testified at the hearing (Tr. 31-54, 55-59). Following the conclusion of the

hearing, ALJ Price entered a hearing decision on May 20, 2013, that found Tiffany is not

disabled for the purposes of the Social Security Act (Tr. 9-23).

In his adverse decision, ALJ Price made the following findings:

1.      The claimant last met the insured status requirements of the Social Security Act
        on Dec. 31, 2012.

2.      The claimant did not engage in substantial gainful activity during the period from his alleged onset date of Nov. 23, 2007, through his date last insured of Dec. 31, 2012 (20 C.F.R. 404.1571, *et seq.*).

3.      Through the date last insured, the claimant has the following severe impairments: headaches, cervical disk degeneration, tinnitus and anxiety (20 C.F.R. 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except he may not perform overhead work or climb ladders, ropes or scaffolds. He must avoid exposure to hazards, temperature extremes and vibrations and may have no more than moderate exposure to loud noises.  He may not drive a commercial vehicle. Due to his mental impairment, he is limited to simple 1-to-2 step tasks in a low stress, object oriented setting that is free from fast paced or production quota work.  He cannot work in tandem with others and he may not interact with the general public or large crowds of more than 10 people.  He may have occasional but superficial contact with co-workers and supervisors.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

7.      The claimant was born on July 14, 1984, and was 28-years-old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. 404.1563).

8.      The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569, 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from Nov. 23, 2007, the alleged onset date, through Dec. 31, 2012, the date last insured (20 C.F.R. 404.1520(g)).

(Tr. 14-23). Tiffany sought review of the hearing decision by the Appeals Council (Tr. 7-8).

The Appeals Council denied his request for review, finding no reason under the Rules to review

ALJ Price's decision (Tr. 1-6). The present lawsuit followed.


**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death, or which has lasted or can be expected to last for a continuous period of not less

than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for

DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20

CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the

claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the

claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See,*

*Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of

the evaluation process whether the claimant has a severe impairment or combination of severe

impairments that significantly limit his or her ability to perform basic work activities. See 20

CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined

by the Commissioner to be non-severe, in other words, so slight that they could not result in a

finding of disability irrespective of a claimant's vocational factors, then the claimant will be

determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).

Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th

Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues Presented.**

Tiffany does not take issue with findings of fact nos. 1-4 of ALJ Price's hearing decision (Tr. 14). In other words, he does not dispute the findings that relate to his insured status, the absence of substantial gainful activity after his alleged onset date, his identified severe impairments (headaches, cervical disk degeneration, tinnitus and anxiety) and that these impairments, alone or in combination, do not meet or equal the severity of any of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Instead, Tiffany primarily challenges finding of fact no. 5 of the hearing decision (Tr. 16-21).

Finding no. 5 contains the finding of the ALJ on Tiffany's residual functional capacity (RFC). ALJ Price determined in this finding that Tiffany has the RFC to perform a limited range of light work excluding overhead work or climbing ladders, ropes or scaffolds (Tr. 16). In this finding, ALJ Price also limits Tiffany from exposure to hazards, temperature extremes and vibrations. He precludes Tiffany from operating a commercial vehicle. Due to Tiffany's mental impairment, ALJ Price limits him to simple 1-to-2 step tasks in a low stress, object oriented setting free from fast pace or production quota work. ALJ Price also found that Tiffany cannot work in tandem with others, that he may not interact with the general public or large crowds of more than 10 people, and may have only occasional or superficial contact with co-workers and supervisors (Tr. 16).

Tiffany now argues that this finding by ALJ Price is not supported by substantial evidence for a number of reasons. First, Tiffany claims that the ALJ failed to give appropriate weight to the fact that Tiffany has been found totally disabled by the Veterans Administration as the result of chronic headaches, anxiety, depression and tinnitus he suffers as the result of traumatic brain injury he received after being exposed to three explosions from improvised explosive devices (IED's) in 2006, while serving in the Army in Iraq (DN 9, pp. 8-10). ALJ Price acknowledged the VA disability determination, but in Tiffany's view, failed to accord it appropriate weight in his analysis based on the erroneous conclusion that Tiffany's subjective complaints of debilitating daily headaches were not adequately supported in the medical records. Tiffany argues that this conclusion simply ignores his hearing testimony that he experiences daily headaches of a severe nature that can last for days, and have necessitated his documented emergency room treatment at the VA repeatedly. The existence of these headaches, Tiffany notes, also is confirmed by the information provided by his father.

Tiffany continues that, regardless of whether the VA disability determination itself cites specific portions of the VA medical records in support of his 100% disability rating, it nevertheless is apparent from those same medical records that he suffers from anxiety, tinnitus, chronic headaches and shrapnel fragmentation. His treatment records confirm his ongoing efforts to obtain effective treatment for his severe impairments on numerous occasions. While Tiffany acknowledges that the Commissioner is not bound by the disability determination of another federal agency, he contends that the ALJ simply failed to accord it appropriate weight in his own case. Tiffany cites in this regard *Steward v. Heckler*, 730 F.2d 1065, in which the Sixth Circuit found that the subjective complaints of a claimant, along with the VA determination of 100% disability, required an award of Social Security benefits in the absence of substantial

evidence to the contrary. *See also, King v. Comm'r of Soc. Sec.*, 779 F.Supp.2d 721, 726 (E.D. Mich. 2011) ("[D]isability decisions of other governmental agencies should be taken into account."). Because ALJ Price did not give adequate consideration to the favorable VA disability determination, which Tiffany insists is adequately supported in the medical records, he concludes that ALJ Price erred as both a matter of law, and of fact, in his refusal to give proper weight to the disability determination of a separate federal agency, such as the Veterans Administration, an agency with long experience in making such determinations.

Tiffany next argues that ALJ Price failed to properly consider and give appropriate weight to the opinions of several treating physicians, Dr. John Guarnaschelli, a neurosurgeon, and Dr. Kevin Brown, a treating psychologist, and a consultative examiner, Dr. Robert Nold. The consultative examiner, Dr. Nold, based on his examination of Tiffany, diagnosed traumatic brain injury with severe daily headaches, depressive disorder, hyperlipidemia, shrapnel removed from the left side of the face, neck injury, anxiety disorder, high blood pressure and PTSD (Tr. 912-17). Tiffany points to that portion of Dr. Nold's consultative examination report in which he notes the "no work" restriction imposed by the VA secondary to Tiffany's headaches, and then continues to state that "the claimant's mental health issues also have effect on his ability to perform work activity, but his daily headaches seem to be the most relevant from a physical standpoint." (Tr. 916). Tiffany now insists that ALJ Price erred in not reviewing Dr. Nold's opinion and giving it appropriate weight as required by the Social Security Rulings (SSR).

Tiffany similarly insists that ALJ Price appears to have ignored the opinion of his treating neurosurgeon, Dr. Guaranschelli, who treated Tiffany at the VA Medical Center. Tiffany points to the comments of Dr. Guaranschelli that Tiffany has diffuse bilateral headaches, adding that "it really is disabling to him. He has not been able to be employed as a result of this." (Tr. 363-64).

Tiffany contends that this opinion, from a treating physician, was not accorded any weight by the ALJ when it should have been given controlling weight under the social security regulations.

Tiffany makes the same argument with respect to his treating psychologist, Dr. Brown, who diagnosed Tiffany with anxiety disorder and depressive disorder. In particular, Tiffany points to the comments of Dr. Brown concerning Tiffany's social withdrawal and isolation as symptoms of his depression and anxiety. Dr. Brown noted in this regard that Tiffany's "difficulty with social interaction would present at least a moderate challenge were he to seek employment." (Tr. 408-09). This opinion, which Tiffany contends is contrary to those of Drs. Hernandez and Dawson, in Tiffany's mind directly refutes the comment of ALJ Price that he found no treating providers with an express opinion contrary to that of Hernandez or Dawson.

Tiffany concludes that the failure of the ALJ to evaluate and to give great weight to the opinions of Dr. Guaraschelli and Dr. Brown was directly contrary to well-established Sixth Circuit case law that requires substantial deference to the opinion of a treating physician so long as such opinion is not contradicted, given the greater opportunity of the treating physician to examine and observe the claimant. *See Farris v. Sec'y of HHS*, 773 F.2d 85, 90 (1985); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

In his third argument, Tiffany alleges that ALJ Price failed to follow federal regulations, in particular 20 C.F.R. 404.1529(c) in assessing the credibility of his hearing testimony concerning his headache pain (DN 9, pp. 5-8). Tiffany complains that voluminous medical evidence substantiates his complaints of headache pain resulting from his multiple, explosion-related head injuries he received while serving in Iraq. Tiffany testified that he experiences daily headaches that escalate without warning in severity (Tr. 32-33). His testimony concerning the severity of these headaches, according to Tiffany, is confirmed by the hospital records at the VA

Medical Center, where he obtained treatment at the emergency room on multiple occasions for headaches, memory lapses and confusion (TR. 326, 359, 366-67, 374, 464). These headaches, which rate 4 or 5 on a 10-point scale, have been treated with Tramadol, Valium, Levetiracetam, Hydrocodone, Butalbital, Neuronton, Gabapentin and Keppra (Tr. 33-34, 52-53, 326, 329 359-360, 364). Tiffany points out that his testimony indicates that the above medications were only temporarily effective and in certain instances had side effects such as drowsiness, dizziness and nausea (Tr. 52-53, 210).

Tiffany's medical records confirm that he made headache-related complaints to neuropsychologist Dr. Jeanne Bennett in October of 2008 (Tr. 359). At that time, Tiffany rated his headaches to be a 6 on a 10-point pain scale, despite treatment with Tramadol, Butalbital and Keppra for pain (Tr. 359-60, 364). This headaches pain, Tiffany points out, is accompanied by constant neck pain, which he rates 2 or 3 on a 10-point scale (Tr. 43-44). Tiffany testified that physical activities that require pushing, pulling or the use of his legs, exacerbate his pain (Tr. 43-44). Contrary to the finding of the ALJ, Tiffany insists that his hearing testimony confirms that pain medication simply does not provide substantial benefit. In fact, he is compelled to take multiple Hydrocodone tablets, and would take more, but he is afraid that he will become addicted to pain medication if he does so (DN 33-34).

Further, Tiffany points out that ALJ Price in one portion of his hearing decision rejected Tiffany's pain complaints supposedly because Tiffany had not attempted physical therapy (Tr. 18). Yet, the VA medical records confirm that Tiffany did just that, attempt physical therapy, without success as it only succeeded in reducing his head and neck pain by 50% (Tr. 419-424). Given that his subjective complaints of pain are consistent with the medical record and the

opinions of his treating physicians, Tiffany concludes that the ALJ erred in rejecting the credibility of his testimony in this regard.

We begin out consideration of these arguments with a brief summary of the law as it relates to the determination of residual functional capacity at step 4 of the sequential process. Residual functional capacity is defined by regulation as being "the most you can still do despite your limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). *See Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments."). The Commissioner is required by regulation to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] … record." *Id. See Bingham v. Comm'r*, 186 Fed. Appx. 624, 647-48 (6th Cir. 2006) ("The ALJ is ultimately responsible for determining a claimant's RFC based upon relevant medical and other evidence of record.").

In assessing a claimant's residual functional capacity, the Commissioner will consider all of his or her medically determinable impairments including both severe and non-severe impairments. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). *See Reynolds v. Comm'r* , 424 Fed. Appx. 411, 417-18 (6th Cir. 2011) ("It is true that an ALJ must determine a claimant's residual functional capacity, considering 'numerous factors' including 'medical evidence, non-medical evidence, and the claimant's credibility.'") (quoting *Coldiron v. Comm'r*, 391 Fed. Appx. 435, 443 (6th Cir. 2010)). See also, SSR 96-5p, 1996 WL 374183 at *3 (July 2, 1996). It is the responsibility of the claimant to provide the evidence that the Commissioner will evaluate in making the RFC finding. See 20 C.F.R. §§404.1512(c), 416.912(c). The Commissioner also will consider any statements of the claimant provided by medical sources about what he or she remains able to do, as well as any descriptions or observations of the claimant's limitations

caused by his or her impairments that are provided by the claimant, the claimant's family, friends or other persons.  20 C.F.R. §§405.1545(a)(3), 416.945(a)(3).

A finding of residual functional capacity is used at step 4 of the sequential evaluation process first to determine whether the claimant remains capable of performing his or her past relevant work.  See 20 C.F.R. §§404.1520(f), 404.1560(b), 416.920(f) and 416.960(b).  If the Commissioner determines that a claimant is not able to perform his or her past relevant work, or does not have past relevant work, then the RFC determination is used at step 5 of the sequential evaluation process to help determine whether the claimant can adjust to any other work that exists in the national economy.  See 20 C.F.R. §404.1520(g), 404.1566, 416.920(g) and 416.966.  In this respect, the RFC assessment is used along with information concerning the claimant's vocational background in making the disability determination.  *Id.*

Here, Tiffany maintains that ALJ Price did not follow agency policy or regulations when he found at page 7 of his hearing decision that Tiffany's medically determinable impairments of headaches, cervical disk degeneration, tinnitus and anxiety could be expected to cause his alleged symptoms, but that Tiffany's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Tr. 18).  We therefore must determine whether the ALJ did in fact abide by the regulations, rulings and case law interpreting them in his evaluation of Tiffany's credibility as it relates to his subject symptoms, including the headache-related pain he testified during the administrative hearing.

### *The Credibility Determination*

The law is well established that an administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal

courts will accord "great deference to that credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004). The standard in the Sixth Circuit for evaluating subjective complaints, such as complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853 (6th Cir. 1986). *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan* standard).

Under *Duncan*, the Court first determines whether objective medical evidence of an underlying medical condition is present in the record. *Id*. If so, then the Court will examine whether such evidence confirms the severity of the claimant's subjective symptoms related to the condition, or whether the objectively established medical condition itself is of sufficient severity that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling pain. *Id*. The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight and deference given the ability of the ALJ to observe the demeanor and credibility of the witnesses. *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)). Yet, the ALJ is not accorded absolute deference and his or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must set forth specific reasons in the hearing decision for the credibility determination sufficient to make clear to the

claimant and to subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. *Id*. at 823 n. 14 (citing SSR 96-7p). Also included among the evidence that the ALJ must consider are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. *Id*.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning*, 661 F. Supp.2d at 823. The reviewing court does not make its own credibility

determinations. *Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at 528)). The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility." *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)). Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'" *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Examination of the hearing decision in light of the medical evidence of record and the testimony of the claimant persuades the Court that ALJ Price's hearing decision is supported by substantial evidence insofar as his credibility determination of Tiffany's complaints of debilitating pain is concerned. The record does confirm that while serving in the U.S. Army as a tank crewman deployed to Iraq in 2006, Tiffany suffered three incidents of traumatic brain injuries. These injuries occurred in April, May and August of 2006, when the 22-year-old Tiffany, while acting as a turret gunner on a Humvee, was caught on three different occasions in the blast of an IED (Tr. 309-64, 599-907, 913-921-63). His resulting injuries led to his discharge from the military in 2007 and his ongoing treatment at the VA Medical Center for complaints of headache pain.

Despite these complaints, however, as ALJ Price correctly noted, diagnostic imaging of Tiffany's head and brain repeatedly were within normal limits. In fact, Tiffany's skull was repeatedly noted to be "essentially normal." (Tr. 309-311). A CT head scan in both March and October of 2008, reveal "no acute intracranial abnormality" and "stable subcutaneous radiopaque

foci." (Tr. 309-11, 314-15). This diagnostic imaging was noted by Dr. Guarneschelli to be "essentially normal" with "no evidence of fracture" and "no evidence of a foreign body." (Tr. 356). Dr. Guarneschelli accordingly concluded that Tiffany had no shrapnel fragments present (Id., 356, 363). What Tiffany apparently believed to be shrapnel fragments on the left side of his face above his temple were actually determined to be merely calcium deposits (Tr. 363-64).

More recent diagnostic imaging, a CT scan of Tiffany's head, performed on July 2, 2010, likewise was unremarkable (Tr. 599-600). A CT scan of the head with and without contrast showed that Tiffany's ventricles and sulci were appropriate for his age, that he had appropriate gray-white matter differentiation with no extra-axial fluid collections, masses, or evidence of intracranial hemorrhage or areas of abnormal enhancement (Tr. 600). Accordingly, the impression on that occasion was "normal head CT [scan]" (Id.).

Not only did Tiffany have normal diagnostic imaging of his head and brain, the medical records, as noted by the ALJ, also repeatedly reflected normal neurological test results. In fact, Dr. Guarneschelli in his treatment notes dated Sept.23, 2008, specifically observed that "of importance is that his [Tiffany's] neurological exam is completely normal. He has no papilledema, no other lateralizing neurological dysfunction." (Tr. 364).

A mental status examination by Dr. Alexi Hernandez at the VA Medical Center on Sept. 28, 2011, revealed Tiffany to be fully oriented with normal memory, concentration and attention span, along with normal speech (Tr. 650). Neurological examination also was noted to be normal on Oct. 18, 2010 (Tr. 676). An earlier neurological examination performed by Dr. Mark Burns at the VA Medical Center on Dec. 5, 2007, revealed normal gait and station, normal motor strength and normal heel/toe walking and knee squat (Tr. 896). Likewise, Dr. Robert Nold in his most recent consultative physical examination of Nov. 13, 2012, found Tiffany to be fully

oriented to time, place and person, with a normal mood and effect (Tr. 915). Dr. Nold found Tiffany's gait to be normal, his motor strength 5/5 in the lower extremities with his cranial nerves grossly intact. Tiffany was able to heel/toe and tandem walk without difficulty, perform a full knee squat without pain, and had equal deep tendon reflexes, as well (Id.).

Despite his testimony of severe, debilitating daily headaches, treatment records as correctly noted by the ALJ, contain treatment notes from various medical sources which reflect statements by Tiffany that he only experienced headaches of such severity every several months. For example, Tiffany related to APRN Barbara Huffines on April 23, 2012, that "hydrocodone helped" and that he had "severe pain 1 every couple of months." (Tr. 627). Likewise, on Jan. 4, 2012, Tiffany reported to RN Rhonda Scott, his case manager at the VA Medical Center, that he experienced migraine headaches "approximately every two months." (Tr. 643). The same treatment notes that Tiffany resides alone, attend E-town Community College where he has a 3.0 GPA after two semesters, plays videogames, and "helps his father out at work during leisure time." (Tr. 643).

Various treatment notes, cited by the ALJ, also reflect that Tiffany obtained relief from his headaches for varying periods of time in response to his pain medications. Tiffany reported in December of 2007, that Seroquel helped him sleep (Tr. 374). He similarly indicated that "Keppa helps his headaches," although it did not eliminate them. (Tr. 381, 387). Tiffany reported in January of 2012, that Neurontin had helped "some," that he had severe headaches "about 1/3 months," and otherwise has mild, tolerable headaches most of the time (Tr. 644). Similarly, earlier progress notes of Sept. 28, 2011, indicate that Tiffany upon reporting by himself for a follow-up visit for his chronic headaches reported that since his previous visit "he continued to have mild daily headaches that improve with Neurontin to a certain degree only."

(Tr. 649). The same progress notes immediately continue to add that "he has infrequent severe headache with migraine features every approximately 2 months with no response to Gabapentin." (Tr. 644, 950). Accordingly, the credibility determination of ALJ Price appears to be supported by substantial evidence insofar as he determined that the intensity, persistence and limiting effects of Tiffany's subjective complaints of headache-related pain are not entirely credible.

ALJ Price also appropriately rejected Tiffany's credibility to the extent that he alleged disabling levels of pain due to his neck condition. Once again, objective medical testing was correctly observed by ALJ Price to be essentially normal with no evidence of disk bulging, disk protrusions or herniation in Tiffany's neck. A radiology report of the cervical spine, without contrast, dated July 2, 2010, revealed only a "mild reversal" of the normal cervical lordosis centered at the C4 "with the cervical spine otherwise unremarkable." (Tr. 601-02). No fractures or subluxations were demonstrated. No radiopaque foreign bodies were noted (Tr. 602). Other than a mild straightening of the normal cervical curve, the boney spinal canal and neural foramina were noted to be "adequately patent at each level." (Id.). The impression of the radiologist, Dr. Donald Evans, was "normal cervical spine." (Tr. 608).

Tiffany likewise exhibited intact fine and gross manipulation in his upper extremities with normal motor functioning and muscle tone, strength and intact sensation therein (Tr. 326, 348, 630, 650, 678, 696). Dr. Nold during his consultative physical exam in November of 2012, specifically noted that Tiffany's neck was supple and that he was able to flex, extend, rotate and "tilt his cervical spine through a full range of motion." (Tr. 914). Dr. Nold noted Tiffany's extremities appeared to be grossly symmetrical with no evidence of atrophy, and  normal pulses,

muscle bulk and tone (Tr. 915). Thus, the objective medical evidence and examination results are supportive of the ALJ's hearing decision in this respect.

It is true that Tiffany did undergo physical therapy in April and May of 2008, contrary to the finding of the ALJ that he had not had physical therapy (Tr. 18). This oversight, however, appears to the Court to be harmless error at worst given the nature of the physical therapy treatment notes found in the record. Those notes indicate that Tiffany's neck pain had improved some with cervical range of motion and stretching exercise (Tr. 417). He had also received relief by the use of a TENS unit (Id.). His physical therapist, Rhonda Thurman, noted that Tiffany's sitting posture (rounded trunk and shoulders) could be contributing to his neck-related pain. Because no further PT interventions were felt to be beneficial in treating Tiffany's neck, his PT was discontinued in June of 2008 (Tr. 418). Physical therapy notes, albeit brief, given the limited duration of Tiffany's therapy, therefore confirm the conservative nature of his treatment and are supportive of the ALJ's determination that Tiffany's neck pain was not of a disabling level.

Substantial evidence also may be found in the record to support ALJ Price's determination that Tiffany is not mentally disabled. The Commissioner correctly notes in her fact and law summary that psychological testing ruled out a diagnosis of post-traumatic stress disorder (Tr. 407). In fact, progress notes summarizing psychological testing results obtained in the fall of 2007, indicate that Tiffany's Minnesota Multi-phasic Personality Inventory (MMPI-2) test results were "remarkable for a pattern of over-endorsement of symptoms" and "a response bias was observed on prior psychological testing reports." (Tr. 407). Progress notes prepared by APRN Huffines dated Feb. 23, 2009, not only indicate a current level of intellectual functioning in the average range with no significant discrepancies between verbal skills and perceptual

organizational abilities, but also reflect that "Mr. Tiffany's personality test was uninterpretable due to over-endorsement of symptoms." (Tr. 731).

Neuropsychological testing performed by Jeanne Bennett, a neuropsychologist, in the fall of 2008, revealed Tiffany's current level of intellectual functioning to be in the average range with no decline in global abilities and normal verbal and visual memory, attention and concentration (Tr. 738-740). In fact, Tiffany on that occasion described his mood as being "mellow" although he did report difficulty sleeping, but no current suicidal ideation and no indications of delusional thinking, paranoid ideation, or formal though disorder (Tr. 738).

In fact, as the Commissioner correctly notes, on Sept. 2, 2008, Tiffany indicated to social worker Janise Madison-Hill that he did not wish to schedule an appointment for therapy (Tr. 742). Tiffany "denied any emotional problems and stated that he had returned to college/school and that being in class 'is his first priority and keeps him occupied.'" (Id.). He denied any suicidal or homicidal thoughts, as well (Id.). ALJ Price therefore gave Tiffany the benefit of the doubt in limiting his residual functioning capacity to 1- and 2-step tasks performed at a low stress, object-oriented setting free from production quotas, and in limiting Tiffany from working in tandem with others or interacting with the general public or crowds of more than 10 people with only occasional, superficial contact with his co-workers and supervisors (Tr. 19).

ALJ Price properly took into consideration Tiffany's reported daily activities in assessing his credibility and making the RFC determination contained in finding of fact no. 5. Review of the record reveals that not only did Tiffany attend college; he exercised regularly at the gym, assisted his father with furniture delivery, hunted, fished, worked on his car, maintained his own home, regularly performed yard work and visited with family and friends (Tr. 38, 48-49, 274, 276, 567-68, 622, 644, 908). This level of activity, as noted by ALJ Price, appears to be

"incongruent with a claim for disability." (Tr. 19). Indeed, Tiffany's appearance and demeanor at the administrative hearing where "he answered questions quickly and appropriately without evidence of a concentration deficit" also support ALJ Price's decision. Such observations by the ALJ of the demeanor of a claimant are not to be discarded lightly and are accorded substantial deference by the courts. *See Casey v. Sec'y of HHS*, 987 F.2d 1230, 1234 (6th Cir. 1993); *Tyra v. Sec'y of HHS*, 896 F.2d 1025, 1030 (6th Cir. 1990) (same).

### The VA Determination

Having determined that ALJ Price appropriately evaluated Tiffany's subjective complaints of pain, the Court turns next to the weight to be afforded to the favorable disability determination of the Veterans Administration. On Sept. 22, 2008, the Dept. of Veterans Affairs notified Tiffany of his entitlement to a 100% disability rating based on his migraine headaches, anxiety, depression, shrapnel fragments and tinnitus (Tr. 962-63). Tiffany argues in Section B of his fact and law summary at pp. 8-10 that ALJ Price failed to give appropriate weight to this VA disability rating.

ALJ Price did acknowledge at p. 10 of his hearing decision that Tiffany has received a 100% disability rating from the VA for his service-related injuries. ALJ Price continued, however, to note that the VA award is not binding and appeared to him to rely "largely on subjective reports from the claimant instead of the overall longitudinal record including objective studies and physical findings." (Tr. 21). As examples of such discrepancies, ALJ Price cited Tiffany's own reports of milder, tolerable headaches with only infrequent severe ones (Id.). He noted that the VA disability determination made no mention whatsoever of the objective diagnostic imaging of Tiffany's head (Id.). ALJ Price also found the VA disability determination to be "questionable" to the extent that it assesses a 50% rating for anxiety, a 30% award for

shrapnel fragmentation, and a 10% award for tinnitus, as "those conditions have no supporting

citation to medical records." (Id.). As earlier noted, Tiffany argues that this portion of the

hearing decision is contrary to *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir. 1984) and *King v.*

*Comm'r of Soc. Sec.*, 779 F.Supp.2d 721, 726 (E.D. Mich. 2011).

Social Security Regulation 20 C.F.R. 404.1504 provides that "a decision by any non-

governmental agency or any other governmental agency about whether you are disabled or blind

is based on its rules and is not our decision about whether your are disabled or blind." *Id*. The

Commissioner therefore is not bound by a disability determination of the Veterans

Administration. *See Rothgeb v. Astrue*, 626 F.Supp.2d 797, 809-10 (S.D. Ohio 2009). Yet, as

*Rothgeb* observes, "The Commissioner nonetheless at least must consider it." *Id*. at 809 (citing

*McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002)). All federal circuit courts require,

at a minimum, that an ALJ give consideration to the disability determination of another agency.

*See*, Carolyn A. Kubitschek, *Social Security Disability: Law and Procedure in the Federal*

*Court*, §2:43 (1994 Supp. 2007).

As *King v Comm'r*, 779 F. Supp.2d at 726, explains "The majority of circuits plainly

require some consideration by the Commissioner of VA disability determinations." *King* then

continues, however, to elaborate that:

> [T]he VA's decision is simply another fact that the ALJ must take into
> account when considering all the evidence. There may be good reason for
> a different outcome, such as an incongruity in the disability standards of
> the respective agencies, or the presentation of new or different evidence to
> one but not the other tribunal.

*Id*. at 726. Accordingly, *King* adopted the approach articulated by the Fifth Circuit in *Chambliss*

*v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001), wherein the Fifth Circuit explains that "the

relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case." *Id*. Because the regulations for disability status differ between the Social Security Administration and the Veterans Administration, *Chambliss* continued to add that "ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so." *Id*.

As our sister district from the Eastern District of Kentucky has noted in *Paul v. Astrue*, 827 F. Supp.2d 739, 743 (E.D. Ky. 2011) "claimants under the Social Security Act are subject to a more rigorous standard than those under the Veterans Administration, and thus the VA's rating decision is not necessarily controlling." *Id*. (citing *Pearson v. Astrue*, 271 Fed. Appx. 979, 981 (11th Cir. 2008)). Accordingly, while the federal courts cannot be left to speculate blindly about an ALJ's rationale for rejecting a 100% permanent disability determination by the Veterans Administration, as occurred in the *King*, 779 F.Supp.2d at 726, a decision wherein the ALJ stated that she had considered the VA's disability determination, but did not explain whether she had accorded any weight to it, an ALJ may validly elect to give a VA disability rating limited weight when the circumstances of the case under review indicate that the VA decision is not adequately supported by the record. *See gen*, SSR 06-03, 2006 WL 2329939 at *3 (Aug. 9, 2006) ("Evidence of a disability decision by another governmental or non-governmental agency cannot be ignored and must be considered.").

Here, ALJ Price did not fail to consider the Sept. 22, 2008 disability determination of the VA, which assessed a 100% disability rating effective Dec. 1, 2008 (Tr. 21, 962-63). ALJ Price cited specific reasons why he did "not find the award to contain convincing details with both subjective and objective support." (Tr. 21). The Court agrees. The objective evidence of record does not appear to support the disability determination of the VA, as ALJ Price correctly noted.

Repeated diagnostic imaging of Tiffany's head was noted to be normal. No evidence of remaining shrapnel was indicated. Further, Tiffany had no history of psychiatric hospitalization or other ongoing mental health treatment, beyond group therapy which he voluntarily discontinued. His own statements to treatment providers, as noted by the ALJ, also called into question the frequency and intensity of his headache-related pain. Accordingly, it cannot be said that ALJ Price failed to appropriately consider the VA's disability determination, much less that his hearing decision somehow represents a "zealous denunciation" of it. We therefore reject Tiffany's second argument.

### The Treating Physician Rule

The final issue to be discussed centers on whether ALJ Price improperly ignored the opinions of several treating medical sources in reaching his determination that Tiffany was not under a disability as defined by the Social Security Act from the time of his alleged onset date of Nov. 23, 2007, through the date he was last insured, Dec. 31, 2012 (Tr. 23). Tiffany, as noted, argues that the hearing decision fails to take into account the opinion of treating neurosurgeon John Guarneschelli and treating psychologist Kevin Brown, as well as that of consultative examiner Dr. Robert Nold (DN 9, pp. 10-13). This argument brings into play the treating source rule, also known as the "treating physician rule."

Under the treating physician rule, the Commissioner's regulations require that the ALJ will give a treating source's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2). *See Cole v. Astrue*, 661 F.3d 931, 937-39 (6th Cir. 2011) (discussing the treating physician rule). A physician will qualify as a treating source if the claimant sees the doctor "with a frequency

consistent with accepted medical practice for the type of treatment/evaluation required for the medical condition." *Smith v. Comm'r of Soc. Security*, 482 F.3d 873, 876 (6th Cir. 2007) (quoting 20 C.F.R. §404.1502).

The treating physician rule rests on the assumption that a medical professional who has dealt with a claimant over a long period of time for a specific illness will have a deeper insight into the medical condition of the claimant than an individual who may have examined the claimant only once or has merely seen the medical records of the claimant. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (citing *Bowman v. Heckler*, 70 F.2d 564, 568 (5th Cir. 1983)). The opinion of a treating source need not be given complete deference, however, if that opinion lacks objective support in the record, is in tension with a prior opinion of the same treating source, lacks meaningful detail, is entirely conclusory, or is in conflict with other evidence of record showing substantial improvement in the claimant's condition. *See White v. Comm'r*, 572 F.3d 272, 285-87 (6th Cir. 2009); *Calvert v. Firstar Financial, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005); *Walters v. Comm'r*, 127 F.3d 525, 530 (6th Cir. 1997); *Cutlip v. Sec'y*, 25 F.3d 284 (6th Cir. 1994).

Even in those circumstances in which the Commissioner does not give the opinion of a treating physician controlling weight, it may still be given great weight. *White*, 572 F.3d at 286 (citing SSR 96-2p). When an ALJ declines to give controlling weight to the opinion of a treating source, the ALJ must balance a number of factors to evaluate what weight the opinion should be given. *Wilson*, 378 F.3d at 544. These factors include the length of the treatment relationship, frequency of examination, the nature and extent of the treatment provided, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Cole*, 661 F.3d at 937 (citing 20 C.F.R. §404.1527(d)(2)).

As to the importance of these factors when determining the weight to be given the opinion of a treating source, *Cole* explains:

> [T]he Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion 20 C.F.R. §404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. S.S.R. 96-2p (1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended 'to let claimant's understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed his disabled and therefore might be especially bewildered when told by an administrative bureaucracy that ... he is not." *Wilson*, 378 F.3d at 544.

*Cole*, 661 F.3d at 937-38.

When an ALJ fails to conduct a balancing of the above factors to determine the weight that should be awarded to a treating source opinion, such as occurred in *Cole*, the Sixth Circuit has made clear that it does not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Cole*, 661 F.3d at 939 (citing *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545)).

Examination of the record reveals that ALJ Price did not run afoul of the treating physician rule in his treatment of Tiffany's disability claim. ALJ Price, for example, did not improperly fail to take into consideration the opinion of Dr. Guarneschelli. Tiffany quotes a portion of a treatment note of Sept. 23, 2008 (Tr. 363-364). In particular, he quotes that portion of the treatment notes wherein Dr. Guarnescelli states that "he has diffuse headaches, diffuse

bilateral front and back.  It really is disabling to him.  He has not been able to be employed as a result of this."  (Tr. 364).

Examination of the full treatment note of Sept. 23, 2008, indicates to the Court that Dr. Guarneschelli is reflecting the statements made by Tiffany to the doctor on that occasion. Further along in the same paragraph from which the quoted language is taken there appears in Dr. Guarneschelli's note that "he states that he really is not employable because of this."  (Tr. 364).  In other words, it is Tiffany who is expressing his opinion to the doctor that Tiffany is unemployable.  Even if this an opinion were expressed by Dr. Guarneschelli, which it does not appear to be, such an opinion falls within the exclusive province of the Commissioner so that ALJ Price would not be bound by it.  See 20 C.F.R. §404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).  See also, SSR 96-5p (An opinion on an issue reserved to the Commissioner, even by a treating source, is never entitled to controlling weight).

As for Robert Nold, M.D., the Court first notes that Dr. Nold does not fall within the category of a "treating source" but rather acted as a consultative examiner for a one-time physical examination of the claimant (Tr. 913-16).  That being said, the Court cannot agree with Tiffany that Dr. Nold adopts the "no work" restriction of the VA.  Dr. Nold's report at p. 4 in the discussion section refers to "a no-work restriction from the VA secondary to his [Tiffany's] daily unrelenting headaches," which Dr. Nold indicates "seemed to be most relevant from a physical standpoint." (Tr. 916).  Nevertheless, Dr. Nold otherwise found Tiffany to be "functionally intact."  (Id.).  Even had Dr. Nold adopted a "no work limitation" such as that imposed by the VA, this opinion by Dr. Nold likewise would have directly invaded the province of the Commissioner and would not be entitled to substantial deference, much less controlling weight given 20 C.F.R. §404.1527(d) and SSR 96-5p.

Dr. Kevin Brown, Tiffany's treating psychologist at the VA, did indicate that Tiffany would have difficulty with social interaction, which "would present at least a moderate challenge were he to seek employment." (Tr. 409). ALJ Price in his RFC finding fully took into account this limitation. ALJ Price restricted Tiffany to no interaction with the general public or large crowds of more than 10 people and only occasional and superficial contact with co-workers and supervisors (Tr. 16). This restriction is fully consistent with the quoted portion of Dr. Brown's report of July 14, 2008 (Tr. 409).

The Court notes, as an aside, that the record contains repeated instances in which Tiffany does socially interact. For example, Tiffany indicated that he attended classes on the campus of the Elizabethtown Community College in order to stay connected with his social skills, although it was a challenge for him to do so. Likewise, Tiffany reported that he regularly interacted with family members, and that he regularly works out at the gym. Accordingly, Tiffany's own testimony would seem to contradict significant limitations on social interaction. Nevertheless, ALJ Price gave Tiffany the benefit of the doubt, in accordance with the quoted portion of Dr. Brown's psychological report, in finding of fact no. 5. In short, the Court finds no violation of the treating physician rule in ALJ Price's hearing decision.

Although Tiffany generally disagrees with findings of fact 9, 10 and 11, they are not unsupported by substantial evidence, nor are they the result of an error of law. For example, the existence of transferrable skills was properly found to be immaterial where using the medical-vocational guidelines as a framework for decision making indicated that Tiffany was not disabled regardless of the existence or nonexistence of transferrable skills (Tr. 22). Further, the testimony of V.E. William Irvin (Tr. 54-58), given in response to a hypothetical question from ALJ Price that accurately reflected Tiffany's credible limitations, revealed a substantial number

of alternative jobs that Tiffany can perform given his age, education, past relevant work and residual functional capacity. Such jobs include routing clerk, garment sorter and packer/inspector (Tr. 56-57).

An ALJ may properly rely upon such testimony at step 5 of the sequential evaluation process to satisfy the Commissioner's burden. *Varley v. Sec'y of HHS*, 820 F.2d 777, 779-80 (6th Cir. 1987). Accordingly, the testimony of V.E. Irvin constituted substantial evidence on which to base the adverse disability determination of the Commissioner. *Foster v. Halter*, 279 F.3d 348, 356-57 (6th Cir. 2001); *Sias v. Sec'y of HHS*, 861 F.2d 475, 480 (6th Cir. 1988). For these reasons, the Magistrate Judge shall recommend that the decision of the Commissioner be affirmed and that the complaint be dismissed with prejudice.

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the decision of the Commissioner be **AFFIRMED** and that the complaint be **DISMISSED WITH PREJUDICE**.

## NOTICE

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Cc:     Counsel of Record